**CITY OF HOUSTON, Appellant,**

v.

**UNITED COMPOST SERVICES, INC.,
Appellee.**

**No. 15791.**

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Feb. 10, 1972.

Rehearing Denied March 9, 1972.

**350**

William A. Olson, City Atty., City of Houston, W. Lawrence Cook, Senior Asst.

City Atty., Willard E. Dollahon, Senior Asst. City Atty., Houston, for appellant.

Fulbright, Crooker & Jaworski, Alton F. Curry, Houston, for appellee, United Compost Services, Inc.

Vinson, Elkins, Searls & Smith, James W. McCartney, Houston, for appellees, Phoenix Mutual Life Ins. Co. and First City National Bank of Houston.

BELL, Chief Justice.

Appeal from a judgment in favor of appellee by which it recovered from appellant the sum of $2,093,669.95 as damages growing out of the breach by appellant of a contract with appellee under which appellee agreed to construct and operate a garbage composting plant. The case was submitted to the jury on three theories of recovery. The first theory was breach of a valid contract by appellant, and the second, and alternative, theory was a contract implied in law. The third asserted estoppel to deny the validity of the contract. The jury's answers to all controlling fact issues submitted were answered favorably to appellee.

Appellant assigns twenty-five points of error. They deal with, in the aggregate, all theories of recovery. We will discuss only those relating to recovery on the theory of breach of contract because we have reached the conclusion that the judgment is supported on a basis of the breach of a valid contract by appellant.

On June 3, 1964, the City Council finally passed an ordinance calling a special election to be held June 27, 1964, at which a proposition concerning a proposed ordinance authorizing a contract for disposal of garbage by composting or other effective methods for a period of not to exceed twenty years would be submitted to the qualified voters.

The preamble to the ordinance, which was expressly made a part of the ordinance, recited that the principal terms of the contract would be as follows:

1. It would be for a term not to exceed 20 years.

2. The contractor would be unconditionally obligated to receive a stated minimum of garbage each day, or at other agreed times, and to dispose of same by composting or by some other agreed method found to be effective, and the City would be obligated to make such garbage available at an agreed location or locations.

3. The City would make no capital investment in the facilities to be utilized by the contractor.

4. The City would pay the contractor a fixed agreed price per ton for each ton disposed of in accordance with the contract.

5. The contractor would be required to furnish a performance bond to be approved by the City Council in an amount found by the City Council to be sufficient to indemnify the City for any failure of the contractor to perform satisfactorily.

The ordinance then provided the following proposition should be submitted:

"Shall the City Council of the City of Houston adopt the proposed ordinance authorizing the negotiation of a contract for the disposal of garbage by composting or other effective method for a term not to exceed twenty years?"

The ordinance designated the locations of the polling places and the person who should be the judge at each place.

It is provided that the ordinance would constitute the election order and the City Secretary was directed to post a copy at each polling place and at the City Hall for not less than 20 days before the election and to cause same to be published on the same day in each of two consecutive weeks in a newspaper of general circulation that had been regularly published in Houston for one year before the date of the ordinance, the first publication to be not less than fourteen days prior to the date of the election.

It is undisputed that the directions immediately above noted with regard to the posting and publication of the ordinance were fully carried out. Publication was in both the Houston Post and Houston Chronicle. In addition a proclamation of the Mayor calling the election and reciting the proposition above quoted, which had been authorized by the ordinance, though not required, was published in the above named newspapers. Voting machines were to be used in holding the election.

Following the election which approved the proposition submitted the City officials negotiated a contract with appellee that was executed March 24, 1965, after having first advertised for bids. The contract was then ratified by the City Council by ordinance. The contract obligated appellee to construct the plant and facilities at its own expense. The plant was to be capable of composting from 300 to 330 tons of garbage per day through employment of the aerobic process. The plant was to be operated in a nuisance-free manner. The City was to pay monthly a specified fee per ton for garbage composted and was to deliver or pay for a minimum tonnage of 1800 tons per week. The plant was to be completed within 12 months following the approval of plans and specifications. The plans and specifications were approved by ordinance August 24, 1965. Failure to complete within said period would subject appellee to a daily penalty of $100 per day. The City claimed a delay of 82 days and exacted a penalty of $8200. It seems not to be contested that the plant was substantially completed in March 1967, so that "shakedown" operations provided for in the contract could and did begin. The operations contemplated that as soon as the plant was "substantially" completed the City, on request of the contractor, would deliver on not less than 24 hours' notice any tonnage of garbage and residential trash the contractor desired to be used for the purpose of testing the equipment and for a "shakedown" of the plant. After the shakedown had been satisfactorily completed the contractor was to notify the City and request a "Test Run" program. During the test run period between 300 and 330 tons of garbage and trash were to be delivered by the City each day for six consecutive business days and such refuse was to be completely processed in full compliance with the contract. The contract provided that "if the contractor shall not successfully complete said test run within 6 months after the scheduled completion date, this contract may be terminated by the City, at its option, at any time thereafter."

Shakedown operations began in early 1967. In March 1967 an attempt to complete a test run was unsuccessful. A second test run was made during April 19–27, 1967. On April 27, appellee wrote the Director of Public Works that the test run had been successful. On April 28 the Director of Public Works wrote appellee a letter stating the "recently completed test run was not successfully completed in accordance with the terms of the contract." The portions of the contract which allegedly had not been complied with dealt generally with the obligation of appellee to operate a nuisance-free plant and not violate any valid law. We do not notice the details of the provision because the City is really contending that the plant emitted odors that penetrated the area outside of the plant and were so extensive as to constitute a nuisance. The letter also stated since appellee had stated the last test run was successful, the City intended "that day" to file a declaratory judgment suit to ascertain the rights of the parties. The suit was filed on April 28, 1967. On April 28, appellee wrote the Mayor stating it had learned through the news media of the unilateral action of the City in refusing to deliver garbage pending judicial determination of the rights of the parties. The letter, while asserting that appellee claimed a successful test run had been made and the contract was in full force and effect, stated that without waiving any claims appellee was thereby notifying the City of completion of shakedown runs and requested the City to fix a test run program. De-

mand was made for the delivery of garbage during the litigation. The City refused to deliver the garbage. Appellee lost its entire investment. There is no contention that the plant was not substantially completed within the time authorized by the contract. Apart from the claim of invalidity of the contract, it is merely contended that when completed on Feb. 2, 1967, as represented by appellee, the plant could not be operated nuisance free. Under the contract there was to be a test run period of six months from completion. The test run period would therefore extend until August 2, 1967.

After the City filed its suit for declaratory judgment, appellee filed its counterclaim against the appellant to recover damages for breach of contract. The City made the First City National Bank of Houston, Trustee for Phoenix Mutual Life Insurance Company, and said insurance company parties to the suit. The insurance company, who had furnished the financing to appellee, plead against appellee to recover its debt and to foreclose its lien. It recovered of appellee and there is no appeal from that part of the judgment.

By its Third Amended Original Petition appellant asserted for the first time that the contract was void ab initio because Article II, Section 7b of the City Charter providing for an election to be held where a contract of this nature was to be for a longer term than five years, was not complied with in that the proposition submitted at the election did not include the proposed ordinance and the material terms of the contract. It was further asserted that the legislative act, herein referred to as Article 976c, Vernon's Ann.Tex.St., was invalid as being a special local law passed in violation of Article III, Section 56 and Section 57 of the Texas Constitution, Vernon's Ann.St. and was therefore ineffective to validate the contract.

█ We reach the conclusion that there was sufficient compliance with the Charter

provision and also that even if there were irregularities that affected the validity of the contract, and we think there were none, Article 976c is valid and had the effect of validating the contract.

Article II, Section 7 of the CHARTER makes it the duty of the City "to care for and dispose of . . . garbage . . . and to make rules and regulations governing the same . . ." Also Article II, Section 2 of the Charter is granted broad power to do acts affecting the general welfare, including, in addition to those express and implied, "all other powers" which "it would have been competent for this Charter to enumerate."

Article II, Section 7b also gives the power to buy, among other things a service. The power to make the contract for disposal of garbage existed. Article II, Section 7b merely deals with the mechanics of the exercise of the power where the contract is for a term longer than five years. That section provides "that before the City shall be bound by any contract sought to be made by the council . . . for a longer period of time than five years, the proposition therefor shall be submitted to a vote . . . which proposition shall consist of the ordinance proposed . . . and the material terms of the contract . . ."

The full 15 page ordinance was not put on the voting machine. An ordinance of this length could not as a practical matter have been incorporated verbatim in the proposition and put in the voting machine. However, it was just as effectively at the polls by posting for the voters to see as if it had been incorporated verbatim in the proposition and printed on the ballot. The proposition on the voting machine asked if City Council should adopt the proposed ordinance authorizing the negotiation of a contract for disposal of garbage by composting, or other effective method, for a term not to exceed 20 years. This gave the essentials. Also it had been published in full in the newspapers in Houston. The

terms of the ordinance we have noticed above. It certainly gives notice of the material terms of the contract to be negotiated.

We hold the terms of Article II, Section 7b were sufficiently complied with. If it may be argued there was not literal compliance, certainly it must be said there was substantial compliance. This is all that is required. Railroad Commission v. Sterling Oil Co., 147 Tex. 547, 218 S.W.2d 415; Christy v. Williams, 292 S.W.2d 348 (Tex. Civ.App.—Galveston) writ dism'd, w. o. j.; England v. McCoy, 269 S.W.2d 813 (Tex. Civ.App.—Texarkana) writ dism'd; 29 C. J.S. Elections § 170; 29 Am.Jur.2d, Elections, 221.

While we hold the contract was valid for the reasons stated above, if there were any defects they were cured by the legislative validating act that became effective June 1, 1965. Article 976c, Section 1 of the act provides it "is applicable only to cities (including Home Rule Cities) having a population in excess of 900,000, according to the last preceding Federal Census or any future Federal Census." Section 2 provides that in every instance where the governing body of a city, prior to the effective date of the act, has entered into a contract involving terms in excess of five years for the use of land or interest in land owned or to be acquired by such city and for the purpose of services related to garbage disposal and for the disposal of garbage on a contract basis, and has adopted orders or ordinances to authorize or ratify the execution of such contracts and all proceedings, ordinances, orders are validated, ratified, confirmed and approved.

Appellant urges the unconstitutionality of the acts asserting that at the time of passage, and when it became effective it could only apply to appellant. It relies on City of Ft. Worth v. Bobbitt, 121 Tex. 14, 36 S.W.2d 470 (Tex.Com.App.), opinion adopted. That case is not controlling. There the validating act applied to a city having not less than 106,000 and not more than 110,000 inhabitants "according to the United States Census of 1920." Ft. Worth was the only city in that population bracket. Because of the wording "according to the United States Census of 1920" the act could never in any contingency apply to any other city. However, a new validating act was passed that applied to cities having "a population of more than 100,000 inhabitants according to the last preceding United States census." This was upheld as not being a local or special law. See 121 Tex. 14, 41 S.W.2d 228 (Tex.Com.App.).

Article 976c is not so restrictive that it could never apply to another city because it would be applicable to any city having a population in excess of 900,000 inhabitants according to the last or any future Federal Census.

The burden is on the party asserting unconstitutionality of a statute to establish its invalidity. Every intendment and presumption will be made in favor of the constitutionality of the statute. County of Cameron v. Wilson, 160 Tex. 25, 326 S. W.2d 162; Koy v. Schneider, 110 Tex. 369, 221 S.W. 880; 53 Tex.Jur.2d, Statutes, Section 184. Appellant has failed to discharge that burden. While it urges that when passed and when it became effective the act could only apply to Houston because Houston was the city with over 900,000 inhabitants, this is not enough. The act was drawn so that it would apply to cities later. There is no evidence that there were no other cities that had contracts of the kind validated. Presumptively there were and the act would be applicable to them when they reached the requisite population. In a comparable situation the same contention was made by the City of Houston and rejected by our Supreme Court. Board of Managers of Harris County Hospital District v. Pension Board of Pension System for City of Houston, Tex., 449 S.W.2d 33.

It was clearly established that after April 27, 1967, the City refused to deliver garbage to appellee so appellee could con-

tinue test runs. This resulted in appellee being unable to repay its indebtedness and it lost its entire investment represented by the expenses incurred in constructing the plant. It was known to all parties that appellee would borrow the money to construct the plant and that the revenues derived from performance of the contract would be the source of repayment. The contract and plant were the security for the loan. That they would be was known to all parties. The City knew the sole income was the per ton service fee to be paid by the City and the revenue received by appellee from the sale of salvageable materials and compost obtained from the garbage delivered by the City.

The jury found in response to Special Issue No. 13 that appellee "could have in all reasonable probability completed a test run without emitting offensive or obnoxious odors outside of the plant premises within six months from February 2, 1967, if the City of Houston had not refused from and after April 27, 1967 to deliver garbage" to appellee. There is no attack made on that finding as being without support in the evidence or as being insufficiently supported by the evidence. We have a case where an appellee has performed its part of the contract insofar as the City permitted and in doing so necessarily incurred vast expenses. Since the City breached its part of the contract it prevented appellee from fully completing the contract. Appellee seeks, therefore, to recover the expenses it reasonably and necessarily incurred in performing.

The jury found in response to Special Issue No. 14 that the amount of expenses which appellee "reasonably and necessarily" incurred to April 28, 1967, in preparation for performance of the contract to be $1,928,117.70. It found in response to Issue No. 14-a that such expenses incurred after April 28 were $379,853.60. Judgment was for the total of these two sums less credits of $214,301.35

Appellant complains of the submission of the issues, the substance of these complaints being as follows:

1. There was no pleading or evidence of the value of the contract to appellee and here that is the measure of damages.

2. There was error in allowing recovery of the amounts expended instead of limiting recovery to amounts determined according to Section 4F of the contract.

3. Allowing a lump sum recovery is error because it creates a debt against the City when there was no compliance with Article XI, Sections 5 and 7 of the Texas Constitution.

4. The damages should have been limited to $200,000 because this was all appellee had repaid on its loan.

Appellee sued to recover as damages the expenses reasonably and necessarily incurred and the jury found the amount. The evidence supports the jury's findings.

■ Appellee could not recover for lost profits because its business had not yet been established. It was in effect a new business. Southwest Battery Corp. v. Owen, 131 Tex. 423, 115 S.W.2d 1097.

■ The rule is that where complete performance by a party to the contract has been prevented by the other party the party suffering the loss is entitled to recover, if it chooses, the amount of its expenses incurred in preparation for performance and in performance of the contract. United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168; Delhi Pipe Line Corp. v. Lewis, Inc., 408 S.W.2d 295 (Tex.Civ.App. —Corpus Christi), ref. n. r. e.; Austin Stone Industries, Inc. v. Capitol Powder Company, 290 S.W.2d 689 (Tex.Civ.Ap —Austin), ref., n. r. e.; Osage Oil & Refining Co. v. Lee Farm Oil Co., 230 S.W. 518 (Tex.Civ.App.—Amarillo), writ ref.; Corbin, Contracts, Sections 996, 1031–1036. The form of issue submitted in this case

was approved in Delhi Pipe Line Co. v. Lewis, Inc., supra.

■ Appellant contends that paragraph 4F of the contract precludes recovery of expenses. This paragraph provides that except for delivery of materials for disposal, payment of the service fee and furnishing the plant site and landfill site, the City shall have no obligation. It places on appellee the obligation to construct and operate the plant at its cost and expense and provides the City shall have no liability for such. The City cites no authority for its position. The liability asserted here does not arise out of the contract but arises by reason of a breach of the contract in preventing complete performance by appellee. The rule of damages applicable is therefore the one above stated. It is extensively discussed in the sections of Corbin on Contracts above cited.

■ The substance of Article XI, Sections 5 and 7, is that no debt shall be created by a city unless at the time it is created provision is made for levy and collection of a tax sufficient to pay the debt. The City cites no decided case in support of its position. The term "debt" as used in these sections refers to an obligation imposed by the contract and not one imposed by law for breach of a valid contract. City of Dallas v. Miller, 7 Tex.Civ.App. 503, 27 S.W. 498 (Dallas), n. w. h.

■ We also overrule the City's contention that recovery should be limited to the $200,000 appellee has repaid on the loan. Appellee is legally obligated to pay all it recovered from appellant, less what it had paid, as Phoenix, the lender, recovered a judgment against appellee for the monies used by appellee in performing the contract. See Taylor v. Mark, 376 S.W.2d 927 (Tex.Civ.App.—Waco), ref., n. r. e., and authorities there cited.

■ Issue No. 13 inquired whether in reasonable probability appellee could have, had the City not refused to deliver garbage, successfully completed a test run without emitting offensive or obnoxious odors outside the plant premises within six months from February 2, 1967. The objections of appellant were that an affirmative answer would be so against the great weight and preponderance of the evidence as to be unjust, and the term "reasonable probability" should not be used as it makes a jury finding speculative and also the contract would not have gone into effect based on reasonable probability.

■ A reading of the statement of facts shows evidence clearly supporting submission and the affirmative answer and the answer is not contrary to the overwhelming weight of the evidence. Actually in its brief appellant does not properly assign that the answer is contrary to the greater weight of the evidence. It complains of the submission of the issue. If there is evidence of probative force the issue should be submitted even though an affirmative answer would be against the greater weight of the evidence. We also hold use of the term "in reasonable probability" was proper.

■ There was no error in refusing the City's requested issue which inquired whether the plant emitted odors that caused annoyance, harm or inconvenience to persons in the vicinity of the plant during the period from February 2, 1967 through April 18, 1967. This was not a controlling issue. Appellee had until August 2 to make the plant nuisance free. It breached the contract in April. How the plant operated prior to the expiration of the test run period is not an ultimate issue. It is purely evidentiary on the issue submitted.

■ The City's other requested issue as to whether the continuation of the operation of the plant after April 26 in all reasonable probability resulted in the spreading of odors, etc., was properly refused. It amounted to the converse of Issue No. 13. It is not error to refuse to submit the converse of an issue. Northeast Texas Motor

Lines v. Hodges, 138 Tex. 280, 158 S.W.2d 487 (Tex.Com.App.), opinion adopted.

The court did not err in refusing to require appellee to elect prior to submission to the jury between express and implied contract. Electric Wire and Cable Co. v. Ray, 456 S.W.2d 260 (Tex.Civ.App. —Houston—1st), ref., n. r. e.; Roby Industries, Inc. v. Maxwell Electronics Corp., 409 S.W.2d 559 (Tex.Civ.App.—Dallas), ref., n. r. e.; Musick v. Pogue, 330 S.W.2d 696 (Tex.Civ.App.—San Antonio), ref., n. r. e.; Hodges, Special Issue Submission in Texas, Section 1, p. 3.

Any point of error relating to recovery on the theory of express contract, though it may not have been specifically discussed, has been considered and is overruled.

Affirmed.