**SAN ANTONIO RIVER AUTHORITY,**
Appellant,

v.

**Curtis R. HUNT, Appellee.**

**No. 167.**

Court of Civil Appeals of Texas.

Corpus Christi.

June 16, 1966.

Rehearing Denied Aug. 18, 1966.

Harvey L. Hardy, Fred N. Pfeiffer, San Antonio, for appellant.

Pat Gardner and Ralph G. Langley, of Foster, Lewis, Langley, Gardner & Hawn, San Antonio, for appellee.

## OPINION

SHARPE, Justice.

Appellant herein originally filed suit against certain owners of irrigated tracts of land along the San Juan Mission Acequia, individually, and as representatives of a class, for declaratory judgment to determine questions concerning the liability or non-liability of appellant to those owners for the taking, damaging or destruction of their properties in connection with the changing, straightening, widening and deepening of the channel of the San Antonio River, a flood control project. The decision of the Supreme Court of Texas on that phase of the case, in which summary judgment was involved, is styled San Antonio River Authority v. Lewis, et al, reported in 363 S.W.2d 444 (Tex.1962). The final opinion of that court was rendered on motion for rehearing, with four justices dissenting. The judgment of the Court of Civil Appeals at San Antonio, 343 S.W.2d 475 (arrived at with the Chief Justice dissenting), reversing and remanding the case for trial, was thereby affirmed by the Supreme Court.

Thereafter, by agreed order, the cross-action of appellee was severed for trial and the parties realigned with appellee as plaintiff and appellant as defendant. After jury trial, judgment was rendered in favor of appellee for $8,500.00 with interest from March 25, 1958. The parties will sometimes hereafter be referred to as "Hunt" and "SARA".

At the outset we believe that consideration should be given to the context in which the instant severed proceeding was tried in the court below. Hunt is one of several individual owners of separate tracts of land in the vicinity of Old Mission San Juan Capistrano in Bexar County, Texas. That Mission was established by the Spanish Government on the east side of the San Antonio River in the year 1730, and an acequia or irrigation ditch was built there in the year 1731. Water was diverted from the river by a dam installed in the bed of the river, which raised the level of the water and permitted it to enter the San Juan Ditch by gravity flow through a headgate, thus making it available to the Mission and for irrigation of lands adjacent to the ditch. In 1824, after Mexico became an independent nation, grants of land and water were made by the Mexican Government to settlers along the San Juan Ditch. In 1958, SARA, in connection with a flood control project, destroyed the San Juan Dam and opened a new channel for the river some two hundred feet west of its original bed. The new channel is deeper than the old river bed, which is left high and dry except at flood stage when water might flow through. After Hunt and the other owners of property along the San Juan Ditch lost the gravity flow of water into it, the instant controversy arose and resulted in the filing of a suit by SARA against said owners for declaratory judgment. In that suit SARA claimed that it was not liable to the owners because they had no vested property rights which were taken, damaged or destroyed by the changing of the river channel; and that, in any event, the changing of the river channel was an exercise of the police power of the State for the consequences of which there was no liability in damages. The trial court granted the motion for summary judgment of SARA on the premise that although the owners of property along the San Juan Ditch had "irrigation rights" which were "vested property rights", such rights were held subject to the police power of the State which authorized the taking thereof without payment of compensation, and that such taking was, therefore, *damnum absque injuria.* The Court of Civil Appeals at San Antonio, with the Chief Justice dissenting, held that the owners "have vested property rights in the San Juan Dam, head gate and ditch, of which they cannot be deprived without adequate

compensation, and that the trial court erred in holding that appellants' (owners') damages are *damnum absque injuria."* 343 S.W.2d 475. The Supreme Court of Texas restricted the issue to be decided as follows: "The question to be decided, then, as the issue has been narrowed, is whether under the Mexican grants respondents (owners) acquired, as against the sovereign, vested property rights to have the waters of the San Antonio River continue to flow in their accustomed channel." 363 S.W.2d 447, 448. The opinion of the Court, concurred in by five justices, answered this question in the affirmative, and held that the conduct of SARA in changing the channel of the river and diverting its waters constituted a taking of the owners' property which could not be done without payment of compensation as required by Article 1, Section 17, Constitution of the State of Texas, Vernon's Ann.St. The judgment of the Court of Civil Appeals, which had reversed the judgment of the trial court and remanded the case for trial, was thus affirmed by the Supreme Court. The opinion of the Supreme Court did not pass upon the question as to whether the owners were entitled to maintain the dam in the bed of the river in order to divert water into the ditch. The dissenting opinion in the Supreme Court, concurred in by four justices, disagreed with both majority opinions of the Supreme Court and the Court of Civil Appeals, and was based on the thesis that the owners have no vested right in and to the bed or banks of the San Antonio River, nor to the dam and headgate located therein, and that they have no right to demand that the river remain in its original channel. However, the dissenting opinion also held that the facts in existence at the time the Mexican grants were made could be considered in determining the rights of the parties, and that because of three factors, i. e., (1) that the sole source of water to supply the San Juan Ditch was and is the San Antonio River, (2) that there was in existence before and at the time of the Mexican Grants a device for raising the water level in the

river to a point where it would flow into the San Juan Ditch, and (3) that a consideration was paid by the grantees to the sovereign for their dulas of water in the ditch, that the sovereign should not destroy the dam in the river which was then being used to supply the ditch with water unless some other means were devised whereby water from the river could be obtained to supply the needs of the ditch, or some compensation were paid because of the destruction of the dam. The dissenting opinion further pointed out that a means was then being provided for supplying the ditch with water which did not involve the use of the dam (i. e. pumping); that the problem as to the owners' damages might arise if and when waters were not delivered to the ditch. The record in the instant severed proceeding establishes that delivery of water to the San Juan Ditch, by pumping or otherwise, had ceased at the time of trial herein, and that the contingency discussed in the dissenting opinion was no longer present. The foregoing statement outlines the general context in which the instant case was tried in the court below and in which our decision must be reached.

In the instant severed proceeding, by answers to seven special issues the jury found in substance as follows: (1) That the Mexican Government made grants of land and water to the persons named in Plaintiff's Exhibit No. 35 in the amounts therein specified; (2) that the land and water rights belonging to plaintiff emanated from one or more of the grants made to persons named in Plaintiff's Exhibit No. 35; (3) that the San Juan Ditch Co. and its successors in title have continued to make claims to the right to such water and to make use of the same by gravity flow from May 6, 1914 to March 25, 1958; (4) that the existence of a dam or some other impounding device in the bed of the river was reasonably necessary to the enjoyment for irrigation purposes of the water granted to the users of water from the San Juan Ditch by the Mexican Government as of

the time such grants were made; (5) that the existence of a dam or some other impounding device in the bed of the river was reasonably necessary to the enjoyment for irrigation purposes of the water from the ditch as of the time of diversion of the river channel in 1958; (6) that the land belonging to plaintiff suffered a decrease in its market value because of the loss of water by gravity flow in the San Juan Ditch; and (7) that the amount of decrease in market value of plaintiff's land as a result of the loss of water by gravity flow in the San Juan Ditch as of March 25, 1958, after the flow was diverted, disregarding any pumping activity of defendant, but taking into consideration the right of plaintiff to pump from the San Antonio River, was $8,500.00.

Appellant's twenty points of error and appellee's twenty three counterpoints have been grouped for briefing into nine subdivisions and will be considered by us in the same manner as follows: I. Whether a cause of action was plead by plaintiff. II. Whether a right to recover was proved by plaintiff. III. Whether special issue 2 was supported by pleadings and evidence. IV. Whether prejudicial inadmissible documents were received in evidence. V. Whether there was a variance between the pleadings and proof of ownership by plaintiff. VI. Whether plaintiff's alternative claim based upon appropriative right was erroneously submitted. VII. Whether the need for a dam was submitted without legal basis—either in the pleadings or the evidence. VIII. Whether the proper measure of damage was submitted. IX. Whether defendant was subjected to illegal special damage testimony concerning damages for loss of well water.

I.

(Whether a cause of action was plead by plaintiff)

Appellant's points 1 and 2 are briefed under the first group. Point 1 asserts that 'Plaintiff did not plead a cause of action

under the opinion of the Supreme Court in S.A.R.A. v. Lewis (363 S.W.2d 444) which opinion established as the law of the case, or as controlling precedent, that the only vested right which could entitle Plaintiff to damages would be the right to have the San Antonio River flow in its accustomed channel directly under Mexican grants made in 1824 to his predecessors in title for compensation." Point 2 asserts that plaintiff did not plead that he deraigned title to his land and water right from the Mexican grants of 1824 and therefore failed to plead a cause of action; and that the trial court erred in overruling defendant's special exceptions I and II of its First Amended Original Answer.

Appellant's basic argument concerning the alleged insufficiency of Hunt's pleadings is that he was required to plead that title to his land and water rights was deraigned by regular chain of title from the original Mexican Government grants of said rights. This position is not well taken. Having alleged that the water rights were in fact granted, Hunt fulfilled his burden by alleging that he or his predecessors in title were in exclusive and continuous possession of the water rights for a substantial period of time. Reiter v. Coastal States Gas Producing Company, 382 S.W.2d 243 (Tex.1964); City of East Dallas v. Barksdale, 83 Tex. 117, 18 S.W. 329 (1892); Beaumont & G. N. R. Co. v. Yarbrough, 156 S.W. 252 (Tex.Civ.App.1913, n. w. h.)

An examination of Hunt's trial pleadings reflects that they sufficiently alleged how he derived title to his water rights and land. Among other things, Hunt, as plaintiff, alleged in substance the following: That plaintiff was the owner of about twelve and one half acres of land adjacent to the San Antonio River and the San Juan Irrigation Ditch or Acequia in Bexar County, Texas; that in the year 1731 while Texas was under the jurisdiction of Spain, the San Juan Dam was constructed in the bed of the San Antonio River, and about the same time the San Juan Acequia or Irriga-

tion Ditch was constructed; that the dam and ditch were so planned and designed as to cause a portion of the water of the river as a result of the natural flow thereof to be diverted into the ditch; that water flowing into the ditch from the river passed through the land now owned by plaintiff and portions of the water were used for irrigation and normal domestic purposes connected with the land; that after the waters of the San Antonio River so diverted through the ditch passed through the lands now owned by plaintiff and of other users, the same proceeded back into the San Antonio River at the southermost extremity of the ditch; that a gate was installed in the mouth of the ditch so as to control the flow of waters therein and throughout the years after 1731 the waters of the San Antonio River so diverted into the ditch were used by plaintiff and his predecessors in title; that in about 1824, when Texas was under the jurisdiction of Mexico, a grant was made by Mexico to Juan de Casteneda of two suertes of land aggregating approximately 25.1 acres of land and two dulas of water, and a grant was made by Mexico of one suerte consisting of 16.3 acres of land and one dula of water to Jose Maria Cardenas; said lands being adjacent to the San Juan Ditch; that plaintiff's land consists of approximately 9.9 acres out of the grant to Casteneda and approximately 2.5 acres out of the grant to Cardenas; that for each dula of water the grantees became entitled to the use of one day of water from the ditch every twenty five days; that in the year 1900 a corporation called the San Juan Ditch Company was organized for the purpose of maintaining and controlling the ditch and administering the use of water therefrom; that persons entitled to use or using water from the ditch conveyed their water rights to the corporation in exchange for shares of that company; that the number of shares determined the amount of water which each shareholder would receive; that plaintiff acquired title to his land in 1925 and at the same time acquired title to twelve shares of the corporation which

entitled him to the use of six and one half hours of water from the ditch every ten days; that the San Juan Ditch Company was incorporated for a term of fifty years and its term of existence expired on April 9, 1950, whereupon ownership of all its assets, including all water rights, vested in its shareholders in undivided interests; that after expiration of the charter of the corporation, the shareholders, being the users of water from the San Juan Ditch or Acequia, continued to maintain and control the ditch and to administer the use of the water in the same manner as was done during the existence of the San Juan Ditch Company; that plaintiff was a shareholder of the San Juan Ditch Company at the time its existence ceased and, thus, acquired and had continued to hold an undivided interest in all of the water rights then owned by said company.

■ It must be remembered that SARA, defendant in this severed cause, initiated this controversy by filing suit for declaratory judgment on August 20, 1958. In its original plaintiff's petition seeking such relief SARA alleged in part that the defendants therein " * * * are among what is believed to be some thirty-nine owners of small tracts of land in Bexar County, Texas, on and along the San Juan Irrigation Ditch system, who hold, or claim to hold, said properties, together with easement rights in the irrigation ditch and water rights to use water from the San Antonio River by virtue of grants from the Mexican Government to their predecessors in title dated February 5, 1824; which said grants may be found in the archives of Bexar County, in the vault of the County Clerk of said County." Appellant's original petition for declaratory judgment was not only a part of the original record of the case ultimately appealed to the Supreme Court of Texas, but also was admitted in evidence upon trial of the instant proceeding. In that pleading SARA asked the courts to assume the essential fact that plaintiff herein and others similarly situated had title to their water rights under the Mexican

grants of 1824. Hunt's pleading of which defendant now complains contains an express reference to two of the original grants and makes it clear that he is claiming an undivided interest in all of the water rights existing in the San Juan Ditch. Although Hunt's amended pleadings could have been more explicit, it cannot be said that SARA and its attorneys were not given sufficient information to enable them to properly prepare, plead and try the instant severed proceeding. Suprise or prejudice is not demonstrated. Appellant here places reliance upon cases decided before the adoption of Rule 45, Texas Rules of Civil Procedure, which, of course, are no longer controlling. When we test plaintiff's trial pleadings by that rule and the cases decided under it, we reach the conclusion that in the entire context of this proceeding, fair notice was given to the SARA as to Hunt's position. Gulf, Colorado & Santa Fe Ry. Co. v. Bliss, 368 S.W. 2d 594, 599 (Tex.1963); Lindsey v. State, 194 S.W.2d 413 (Tex.Civ.App.1946, wr.ref., n.r.e.); McDonald, Texas Civil Practice, Sec. 5.05, pp. 483–487, and cases therein cited.

Appellant's first group of points (1 and 2) is overruled.

II.

(Whether a right to recover was proved by plaintiff)

Appellant's points 3, 4 and 5 are briefed under this group. Point 3 asserts that "Plaintiff did not prove a cause of action under the opinion of the Supreme Court in S.A.R.A. v. Lewis (363 S.W.2d 444) which opinion established as the law of the case, or as controlling precedent, that the only vested right which could entitle Plaintiff to damages would be the right to have the San Antonio River flow in its accustomed channel directly under Mexican grants made in 1824 to his predecessors in title for compensation." Point 4 asserts that the evidence was legally insufficient and point 5 that it was factually insufficient

to justify submission to the jury and to support the finding that plaintiff's title to the land and water rights in question emanated from one or more of the Mexican grants of 1824. Appellant briefs these points as if Hunt had plead a good cause of action, that there were no errors in admission of evidence, and that special issue 1, establishing the original Mexican grants, had been properly submitted and answered.

Appellant's argument involves (a) the original grants, (b) the period 1824–1873 and on to 1880, and (c) plaintiff's chain of title to his land from 1880 to 1925. Each category will be separately noted.

*The original grants.* By the jury finding in answer to special issue 1 it is established that the twenty-one original grants of land and water, as mentioned in Plaintiff's Exhibit 35 (Register of land sales and water rights), were made by the Mexican Government in 1824. Exhibit 35 names the original twenty-one grantees and reflects that each grantee was charged a price of five pesos per year for four years for each of the twenty-five dulas of water granted. By Plaintiff's Exhibit 27–34, copies of the original grants were proved up as to eight of the twenty-one original grantees. Plaintiff's Exhibit 18 is a map made in 1874, showing all of the original Mission grants in the San Antonio area with the last name of the original grantee written inside the boundaries depicted for each tract. The names shown on that map correspond substantially with the names listed on Plaintiff's Exhibit 35. Plaintiff's Exhibit 44 is an affidavit recorded with the County Clerk in 1873, purporting to authenticate a Spanish language version of Plaintiff's Exhibit 35, above-mentioned. Each original grant in the record herein contains a statement substantially as follows:

"* * * I do hereby grant him in the name of the Mexican Nation, two dulas of water with its corresponding farm land extracted from the Mission San

Juan Capistrano so that he may cultivate and benefit from said land in accordance to the law, as well as his heirs and succesors who shall take full advantage of its utility paying five pesos for each of the two said dulas for a period of four years as seen fit by the most Excellent Deputation after which time he shall have the pleasure of doing whatever he wishes with the said land, at which time a testimonio or testimonios shall be given him upon request to serve as formal and legal title to the said land."

*The period 1824–1873 and on to 1880.* There is nothing in the record herein between the original grants made in 1824 and the above-mentioned affidavit of 1873 concerning the land and water rights here involved. Between 1873 and 1880 the only item of evidence in the record is the map of 1874, also above-mentioned. The affidavit and map purport to speak as of 1824 and do not describe any subsequent title history. Appellant argues because of such facts that there is a complete void concerning the chain of title to all of the twenty-one original grants for a total of fifty-six years, and that Hunt has not discharged his burden of proof in this case because of such facts.

*Plaintiff's chain of title to his land from 1880 to 1925.* Appellant concedes that Hunt has shown a regular chain of title from 1880 down to the time of the trial of this case on the merits. On July 15, 1880, Thomas J. Devine, as trustee for the estate of F. Guilbeau, deeded all the San Juan lands to C. Villemain " * * * together with all and singular, the water and irrigation rights and privileges * * *." The deed refers to "suertes" (meaning irrigated land), but not to "dulas". No reference is made to the original grants nor to the origin of the suertes involved. The deed also contained the provision "It is hereby declared that the intention of this conveyance is to transfer to the said Celestin Villemain all the right, title and interest that Francisco Guilbeau, at the time of his death, had in and to the Mission San Juan Lands whether the same be expressly described in this deed or not

* * *." It further appears that C. Villemain, grantee in the deed from Devine, replatted the tract into lots and that a regular chain of title exists as to one-half of one of these lots from Villemain down and into Hunt. The water rights owned by Villemain were conveyed to the San Juan Ditch Company, a corporation, in 1900. Twelve of the shares of stock in that corporation, out of a total of four hundred seventy-two, were acquired by Hunt when he purchased his land in 1925. Each share entitled him to one-half hour of water every ten days for irrigation purposes.

Most of what has been said in connection with appellant's first group of points (1–2) is applicable to its second group (3–4). Appellant's basic argument under the latter is that Hunt had the burden to prove by a preponderance of the evidence that he held a legal right "to the granted waters"— "under the Mexican grants" as such "water grants to (his) predecessors in title were made", and that the evidence shows beyond dispute that Hunt holds no property rights based on or derived from such grants. In its brief, appellant concedes that Hunt owns his land and has a right to utilize water from the river but says he has never had a Mexican grant thereto by any kind of chain of title or any way known to the law. Appellant relies heavily upon the gap in the chain of title of fifty-six years as to each of the two grants necessary to Hunt's claim to Mexican suertes, and says there is no evidence herein that the Mexican titles granted in 1824 devolved to a single subsequent grantee. Alternatively, appellant says that even assuming an unbroken chain of title is not required, and that mere "emanation" is sufficient, there is no evidence of such emanation, particularly in view of the fifty-six year gap. Further in the alternative, appellant says that assuming "emanation" is sufficient and that some evidence of it was produced, that the affirmative answer to special issue 2 is against the overwhelming weight and preponderance of the evidence.

We disagree with appellant's contention that Hunt failed to prove a right to recover herein. Plaintiff did not have the burden to prove a chain of title to his water rights from the sovereignty of the soil. No such burden exists in inverse condemnation suits such as this one. In this case plaintiff satisfactorily discharged his burden of proof by evidence showing that the water rights were granted by the Mexican Government and that he or his predecessors were in exclusive and continuous possession of them for a substantial period of time, and that he possessed title to them by prescription. Reiter v. Coastal States Gas Producing Company, 382 S.W.2d 243 (Tex. 1964); City of East Dallas v. Barksdale, 83 Tex. 117, 18 S.W. 329 (1892); Beaumont & G. N. R. Co. v. Yarbrough, 156 S.W. 252 (Tex.Civ.App.1913, n.w.h.).

Even if Hunt had been required to deraign title to his water rights from the sovereign as a part of his proof in this case, we would hold that such burden was discharged on the basis that the original Mexican grants were proved concerning the same property and water rights, and SARA by its pleadings in the declaratory judgment phase of the case, which pleading was admitted in evidence herein, conceded that the present owners had vested rights to take water from the San Antonio River for irrigation. The Supreme Court assumed this in deciding the summary judgment phase of the case on the basis of SARA's position therein.

A careful reading of the opinion of the Supreme Court in S.A.R.A. v. Lewis, supra, in the light of the other authorities just cited supports the view that Hunt sufficiently discharged his burden of proof to establish title to the Mexican water rights in question.

Appellant's second group of points (3 and 4) is overruled.

## III.

(Whether special issue 2 was supported by pleadings and evidence)

Appellant's points 6, 7 and 8 are briefed under this group. Point 6 asserts that since plaintiff did not plead the original Mexican grants of 1824 except for two (Cardenas and Casteneda), there is no pleading to support the judgment, or to authorize evidence of the other nineteen original grants, or to authorize submission of and support the answers to special issues 1 and 2. Point 7 asserts that the judgment should be reversed because special issue 2 allowed the jury to find that emanation of title from one or more of the twenty-one grants made in 1824 was sufficient to vest the property right in question in plaintiff when plaintiff's theory was that San Juan Ditch Company first acquired all of the water rights emanating from the Mexican Government, and that he, in turn, enjoys his rights therein through an undivided interest in the assets of said company; and, under point 8 that the word "emanation" implied that proof of a regular chain of title back to the original grantees of the Mexican Government was not required, which constituted a comment on the weight of the evidence.

Special issues 1 and 2, together with the answers thereto, read as follows:

"QUESTION NO. 1: Do you find, from a preponderance of the evidence, that the Mexican Government made grants of land and water to the persons named in Plaintiff's Exhibit No. 35 in the amounts specified in said exhibit?

Answer 'Yes' or 'No.'

We, the Jury, answer: Yes

If you have answered Question No. 1 'Yes' and only in that event, then answer Question No. 2.

"QUESTION NO. 2: Do you find, from a preponderance of the evidence, that the land, and water rights, if any, belonging

to Mr. Hunt emanated from one or more of the of the land and water grants, if any, made by the Mexican Government to those persons named in Plaintiff's Exhibit No. 35 (if you have found they were so made)?

Answer 'Yes' or 'No.'

We, the Jury, answer: Yes."

■ Appellant's point 6 is not well taken in the light of our holdings herein on its points 1 and 2. Plaintiff's pleadings were sufficient to place defendant on notice that he was claiming an undivided interest in all of the water rights existing in the San Juan Ditch although he claimed that his land fell within two of the original twenty-one Mexican grants, which contention was supported by the evidence. In the complete context of this entire proceeding the pleadings were sufficient to authorize admission of all of such 1824 Mexican grants relating to the San Juan Ditch and to justify submission of special issues 1 and 2. Under points 7 and 8 appellant relies principally upon the position that the plaintiff was required to prove deraignment of title from either Cardenas or Casteneda or from all twenty-one original grantees, which contention we have held bad under our discussion of appellant's first and second group of points. The word "emanated" permitted the jury to find that plaintiff's title was derived from the original grants by means other than through a regular chain of title. We have held this to be proper and, under the circumstances, it appears that special issue 2 as framed by the trial court was not a comment on the weight of the evidence. Plaintiff's allegations and proof that the San Juan Ditch Company acquired the water rights emanating from the Mexican Government, and that he had an undivided interest in said company, is not inconsistent with his theory as to right of recovery.

Appellant's third group of points (6, 7 and 8) is overruled.

IV.

(Whether prejudicial inadmissible documents were received in evidence)

Appellant's points 9, 10, 11 and 12 are briefed under this group. Point 9 asserts that the trial court erred in admitting plaintiff's Exhibit No. 18 (map of 1874). Point 10 asserts error in admission of Plaintiff's Exhibit 44 (affidavit of 1873). Point 11 asserts error in admission of Plaintiff Exhibits Nos. 27–34 (eight Mexican grants of 1824), and testimony relating thereto. Point 12 asserts error in admission of Plaintiff's Exhibit No. 35 (Registry of Dulas).

The pleadings were sufficient to authorize admission of the exhibits mentioned in appellant's points 9, 10, 11 and 12, and our consideration will be limited to points of evidence.

Plaintiff's Exhibit 18 is a map made by ex-district surveyor F. Giraud, purporting to show all of the Mission irrigation systems in the San Antonio area together with the names of the original grantees. This map was used by the witness Jack Brown in connection with his testimony that Hunt's land was part of the tracts originally granted to Cardenas and Castaneda, as plead by Hunt. Plaintiff's Exhibit 44 is an affidavit made by old inhabitants purporting to list, in Spanish, the same registry of waters and amounts charged therefor, as is shown in Exhibit 35, with possibly some additional information.

■ Appellant's argument concerning Exhibits 18 and 44 is primarily based upon the contention that they were inadmissible as official documents and not properly authenticated. Appellee says that they were admissible under the exception to the hearsay rule relating to ancient documents. We agree with appellee. The 1874 map appears on its face to be over ninety years of age, is free from suspicion in appearance and comes from proper custody, i.e., the office of the Land Commissioner of Texas. Its use by title companies in Bexar County,

Texas, was offered as additional evidence of its authenticity. Unofficial maps similar to Plaintiff's Exhibit 18 have been held admissible as ancient documents in situations comparable to that presented here. Finberg v. Gilbert, 104 Tex. 539, 141 S.W. 82 (1911); Seaway Company, Inc. v. Attorney General, 375 S.W.2d 923 (Tex.Civ.App.1964, ref. n.r.e.); James v. Hitchcock, 309 S.W.2d 909 (Tex.Civ.App.1958, ref. n.r.e.); Spencer v. Levy, 173 S.W. 550 (Tex.Civ.App.1914, n.w.h.); Flores v. Hovel, 125 S.W. 606 (Tex.Civ.App.1910, n.w.h.); Magee v. Paul, 110 Tex. 470, 221 S.W. 254 (1920); Mackay v. Armstrong, 84 Tex. 159, 19 S.W. 463 (1892); Dohoney v. Womack, 1 Tex.Civ. App. 354, 19 S.W. 883 (1892). An affidavit similar to Plaintiff's Exhibit 44, the affidavit of 1873, was held admissible as an ancient instrument in the case of Magee v. Paul, 110 Tex. 478, 221 S.W. 254 (1920). In any event, Exhibits 18 and 44 were largely a duplication of Plaintiff's Exhibit 35, the Registry of Land Sales and Water Rights, which we hold was properly admitted. Plaintiff established that certain of the original 1824 grants not in evidence were lost. Under such circumstances they could be proved by recitals or references in other documents. Mackay v. Armstrong, 84 Tex. 159, 19 S.W. 463 (1892); Dohoney v. Womack, 1 Tex.Civ.App. 354, 19 S.W. 883 (1892). Plaintiff's Exhibits 27–34, being eight of the original 1824 Mexican grants were properly authenticated and admitted.

Appellant's fourth group of points (9, 10, 11 and 12) is overruled.

## V.

(Whether there was a variance between the pleadings and proof of ownership by plaintiff)

Point 13 is here involved. Under it appellant contends that plaintiff plead sole ownership of the property in himself, but proved original ownership in himself and wife, Carrie Hunt, as community tenants; that the wife or heirs were not accounted for; and, therefore, the judgment does not dispose of all outstanding interests in the property. These contentions are without merit. There is no requirement that plaintiff plead ownership of the property as being separate or community, and his general allegation of ownership would support the recovery regardless of its character as community or separate. See Taylor v. Higgins Oil & Fuel Co., 2 S.W.2d 288 (Tex.Civ.App.1928, wr. dism.); Hill v. Whitworth, 162 S.W. 434 (Tex.Civ.App. 1914, wr. ref.). Once the existence of the marriage of plaintiff to his wife Carrie was established, it is presumed to continue until dissolution was shown by the evidence. Zieben v. Krakower, 346 S.W.2d 401, 405 (Tex.Civ.App.1961, wr. ref., n.r.e.). There was no evidence here that plaintiff's marriage had been dissolved and the wife is bound by the judgment. Hall v. Aloco Oil Co., 164 S.W.2d 861 (Tex.Civ.App.1942, wr. ref.). The case of Galveston, H. & S.A.R. Co. v. Becht, 21 S.W. 971 (Tex.Civ.App. 1893), relied on by appellant, is not in point. Appellant's point 13 is overruled.

## VI.

(Whether plaintiff's alternative claim based upon appropriative right was improperly submitted)

Appellant's points 14 and 15 are involved in this group, and relate to special issue 3. That issue and the answer thereto reads as follows:

"*QUESTION NO. 3*: Do you find, from a preponderance of the evidence, that the San Juan Ditch Co., and its successors in title, if any, have continued to make claims to the right, if any, to such water, and to make use of the same by gravity flow from May 6, 1914 to March 25, 1958?

Answer 'Yes' or 'No'.

We, the Jury, answer: Yes."

By point 14, appellant contends that the court erred in submitting special issue 3 because as a matter of law Hunt

could acquire no vested right in the accustomed channel of the stream by virtue of a certified filing, or appropriative right which merely permitted beneficial use of not more than a specified amount of water. By point 15, appellant contends that the evidence conclusively shows that the San Juan Ditch Company failed to comply with the mandatory provisions of sections 12 and 14 of the Water Act of 1913 Laws 1913, c. 171 in making a certified filing, rendering it invalid. In reply, Hunt says that he did acquire a vested right to maintain a diversion dam by reason of the certified filing of the ditch company and that there was compliance with the Water Act of 1913 and the certified filing was valid. Although Hunt contends that he plead a right to recover under the certified filing, as well as the original Mexican grants, he concedes that the rights acquired under the certified filing were only cumulative and were not essential to his recovery; but, nevertheless, that such rights under the certified filing served to prove and emphasize the recognition given by the sovereign to the long and continued use of the water and dam by appellee and his predecessor in title. Appellant's point 15 is without merit. There was substantial compliance with the Water Act of 1913 and sections 12 and 14 supra thereof by San Juan Ditch Company. The affidavit filed by it contained the essential information required by the Statute. A second affidavit contemplated by the Statute to be filed upon completion of the diversion works was unnecessary because it is undisputed here that the works here had been installed and completed long before the initial filing and information to that effect was furnished in an original affidavit. Appellee's recovery here was not dependent upon the certified filing of San Juan Ditch Company. The finding on special issue 3 did serve to buttress appellee's contention that he and his predecessors had been in continuous possession of the water rights for substantial period of time and to that extent was proper in any event. Appellant's points 14 and 15 do not present error or reversible error.

## VII.

(Whether the need for a dam was submitted without legal basis)

Appellant's points 16, 17 and 18 are involved under this group, and relate to special issues 4 and 5, which with their answers, read as follows:

"QUESTION NO. 4: Do you find, from a preponderance of the evidence, that the existence of a dam or some other impounding device in the bed of the river was reasonably necessary to the enjoyment for irrigation purposes of the water granted to the users of water from the San Juan Ditch by the Mexican Government as of the time such grants, if any, were made?

Answer 'Yes' or 'No'.

We, the Jury, answer: Yes"

"QUESTION NO. 5: Do you find, from a preponderance of the evidence, that the existence of a dam or some other impounding device in the bed of the river was reasonably necessary to the enjoyment for irrigation purposes of the water from the ditch as of the time of diversion of the river channel in 1958?

Answer 'Yes' or 'No'.

We, the Jury, answer: Yes"

By points 16 and 17 appellant contends that there was no pleading to authorize issues 4 or 5 and that the evidence was also factually insufficient to support the answers thereto. By point 18, appellant contends that the undisputed evidence showed that appellant pumped water into the ditch in substantial volume for several years without use of or impounding device, and that the trial court erred in submitting issue 5. Hunt's pleadings were sufficient to raise special issues 4 and 5. The amended pleading was filed fol-

lowing the decision of the Supreme Court in S.A.R.A. v. Lewis, supra, which the trial court could, of course, judicially notice. Womble v. Atkins, 314 S.W.2d 150 (Tex. Civ.App.1958, affirmed 160 Tex. 363, 331 S.W.2d 294); 23 Tex.Jur.2d, Evidence, Sec. 26, pp. 45–47. Plaintiff plead the right to use the dam as a diversion device but did not expressly allege that the dam was reasonably necessary for the diversion of water. However, the latter allegation was implicit from the pleading in the entire context of this case. The evidence was also legally and factually sufficient to support the jury answers to issues 4 and 5.

With reference to plaintiff's right to maintain a dam in the bed of the river, the Supreme Court, in S.A.R.A. v. Lewis, supra, said:

"* * * while the sovereign could, indeed, grant the beds to individuals, * * * it will not be presumed to have done so, and will not be held to have done so in the absence of direct and certain evidence that such was its intention. * * * Acceptance of that fact may well mean that respondents did not acquire property rights in the bed of the San Antonio river. The grants do not expressly create easements or impose servitudes for continued maintenance of the dam in the river bed and it may be strongly reasoned from Spanish law that none are to be implied. * * * Continued existence of the dam in the bed of the river appears not to have been reasonably necessary to enjoyment of the water granted from the acequia; there were other methods of capturing and delivering the water into the ditch. But whether the grants do or do not create easements or impose servitudes in the river is not determinative of the true question in this case * * *."

On the summary judgment phase of the case, the Supreme Court found it unnecessary to pass upon the question as to whether Hunt or the other landowners were entitled to maintain the dam in the bed of the river for the purpose of diverting water into the ditch. However, it appears that such right might well depend upon whether the dam was reasonably necessary for obtaining and using the water granted by the Sovereign. Hunt offered the testimony of a qualified engineer to the effect that a dam or impounding device was reasonably necessary for the enjoyment of the water in 1824 as well as today. Testimony offered by SARA as to pumping operations conducted by it after the river channel was changed did not establish that a dam or impounding device was not reasonably necessary for the enjoyment of the water.

It appears here that the only facilities for obtaining and using the waters of the river were anchored firmly in its existing channel at the time of the grants and made possible a gravity flow of water into the San Juan Ditch. The jury findings that the existence of a dam or some other impounding device was necessary to the enjoyment of water by users of it from the San Juan Ditch at the time of the Mexican grants and at the time of diversion of the river channel in 1958 support the view that such grants included and imposed a servitude in the bed of the river to that extent and the sovereign could not destroy or take the same without just compensation. Such findings had not been made when the case was considered by the Supreme Court on the summary judgment phase of the case. They appear to be material in the present posture of this case where Hunt's position is based upon a claim of deprivation of gravity flow of water into the San Juan Ditch, both in connection with the majority and dissenting views expressed by the members of the Supreme Court in S.A.R.A. v. Lewis, supra.

Appellant's seventh group of points (16, 17 and 18) is overruled.

## VIII.

### (Whether the proper measure of damages was submitted)

Appellant's point 19 is here involved. Special issue 7, relating to appellee's damages, and its answer, reads as follows:

*"QUESTION NO. 7*: What do you find, from a preponderance of the evidence, to have been the amount of decrease, if any, in market value of Mr. Hunt's land, as a result of the loss of water, by gravity flow, in the San Juan Ditch as of March 25, 1958, after the flow was diverted, disregarding any pumping activity of the Defendant, but taking into consideration the right, if any, of Mr. Hunt to pump from the San Antonio River?

Answer by stating the amount, if any, or none.

We, the Jury, answer: $8,500.00"

Appellant contends that the trial court erred in not submitting its requested special issues 8 and 9 reading as follows:

*"Special Issue No. 8:*

Do you find, from a preponderance of the evidence, that the flow of water in the San Juan Ditch can be restored by a pumping operation conducted by the San Juan Ditch Co.?

Answer 'Yes' or 'No'.

We, the Jury, answer: ————."

"Special Issue No. 9:

What do you find, from a preponderance of the evidence, to be the pro rata cost to Plaintiff, Mr. Hunt, of the restoration of water in the San Juan Ditch by the San Juan Ditch Co. through a pumping operation?

Answer by stating the amount, if any, in dollars and cents, or 'None'.

We, the Jury, answer: ————."

Hunt says that his damages were established to be permanent, not temporary, and the trial court properly refused to submit the "cost to cure" measure of damages, as contained in the requested issues 8 and 9; and that said issues were not substantially correct in form and there was no error in refusing to submit them. We agree with appellee.

Special issue 7 in this case is in substantially the same form as the issues submitted in State v. Blair, 72 S.W.2d 927 (Tex.Civ.App.1934, n. w. h.) and Shofner v. State, 207 S.W.2d 426 (Tex. Civ.App.1948, wr. dism.), and is in accordance with the general rules concerning submission of issues in condemnation cases announced in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, on rehearing, 89 S.W.2d 979. It is undisputed that the injury suffered by appellee here is permanent. There is no occasion to apply the "cost to cure" measure of damages in such instance. The opinions in cases of Trinity & S. Ry. Co. v. Schofield, 72 Tex. 496, 10 S.W. 575 (1889), and Gulf Pipe Line v. Hurst, 230 S.W. 1024 (Tex.Civ.App. 1921, n. w. h.), relied on by appellant, point out that if the damage is found to be temporary the "cost to cure" measure would be proper; but if the damage is found to be permanent, the "before and after" measure of damages would be correct. In any event, appellant's requested issue 9, which inquires concerning appellee's pro rata cost of pumping water into the ditch, necessarily includes the assumption that other users of water from the ditch would contribute their pro rata share of such cost. There was evidence on this point to the effect that most of the affected landowners would not or could not afford to contribute to the cost of restoring the water by a pumping operation. No issue was requested by appellant in such connection. Without it a complete ground of defense would not be requested and appellant would not, therefore, be in position to complain of failure to submit the issues actually requested. See Hodges, Spe-

cial Issue Submission in Texas, Sec. 68, p. 169, and cases therein cited. The evidence concerning the cost of pumping was before the jury and it was instructed to consider appellee's right to pump in determining the decrease, if any, in the market value of the land. Special issue 7 was correctly submitted under the circumstances shown here and appellant's requested issues 8 and 9 were properly refused. Appellant's point 19 is overruled.

## IX.

(Whether defendant was subjected to illegal special damage testimony concerning damages for loss of well water)

 Appellant's point 20 is here involved. Under it, appellant contends that the trial court erred in admitting testimony of several witnesses to the effect that diversion of the water from the San Juan Ditch operated to dry up Hunt's domestic well and caused specific monetary loss, because the same was irrelevant; that Hunt's water rights entitled him to the use of water for irrigation purposes only; and that such evidence and valuations subjected appellant to liability for double damages or illegal special damages in addition to loss of market value. We disagree with such contentions. Even if appellee was only entitled to use the water for irrigation purposes, nevertheless, the charging of his well was the direct and natural result or irrigation. The testimony supported this view and established that Hunt's water well dried up when the location of the river channel was changed. The well was dug in 1925 and had been charged by irrigation waters from the ditch since that date. The quantity of water used by appellee was fixed by the grants and was not increased by the use of water for charging the well. It appears improbable that Hunt could have irrigated without charging the well. It was advisable to segregate the decrease in market value caused to Hunt's land by loss of well water from decline caused by other effects of the loss of water in the ditch. Without such segregation it would have been difficult for the jury to determine the decrease in value of the land in the event it found that the water in the ditch did not, in fact, charge the well. It does not appear that such segregation resulted in assessment of double or additional damages against appellant. The ultimate issue of decrease in value of Hunt's land as a result of the loss of water in the San Juan Ditch was submitted to the jury by special issue 7. There was no separate submission of damage caused by loss of well water. Under these conditions appellant's point 20 is without merit and is overruled.

The judgment of the trial court is affirmed.